1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC THOMAS WOLFE, | Case No. 1:15-cv-00957-DAD-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| S. PEERY, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

In 2011, Petitioner was convicted after a jury trial in the Tulare County Superior Court of extortion, burglary, home invasion robbery, battery, two counts of dissuading a witness or victim, participation in a criminal street gang, and receiving stolen property. The jury also found true the special allegation that the offenses were committed for the benefit of a street gang. In bifurcated proceedings, the court found prior strike and serious felony special allegations to be true. On December 13, 2011, Petitioner was sentenced to a total of thirty years to life for the home invasion robbery. The sentences on the remaining counts and special allegations were imposed concurrently or were stayed. (ECF No. 14 at 57–58).[1]

---

[1] Page numbers refer to the ECF page numbers stamped at the top of the page.

On October 7, 2013, the California Court of Appeal, Fifth Appellate District, reversed the conviction for receiving stolen property. The case was remanded for resentencing on the extortion and dissuading a witness or victim offenses. (ECF No. 14 at 120). Petitioner filed a petition for review in the California Supreme Court. (LD[2] 26). On February 11, 2014, the California Supreme Court denied Petitioner's petition for review. (LD 27).

On April 30, 2014, Petitioner was resentenced by the Tulare County Superior Court to an imprisonment term of thirty-five years to life. (LD 28). On April 23, 2015, Petitioner filed a state habeas petition in the California Supreme Court. (LD 29). On July 15, 2015, the California Supreme Court denied the petition. (LD 30).

On June 25, 2015, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). Therein, Petitioner raises the following claims for relief: (1) the trial court erroneously instructed the jury with an inapplicable portion of the witness credibility instruction; (2) the trial court erroneously instructed the jury with an inapplicable instruction regarding false or misleading statements and consciousness of guilt; (3) there was insufficient evidence to support the extortion conviction; and (4) juror misconduct violated Petitioner's right to a trial by unbiased, impartial jurors. On October 13, 2015, Respondent filed an answer. (ECF No. 14).

## II.

## STATEMENT OF FACTS[3]

### Facts Specific to the January 2010 Incident

Eric Dahlberg lived across the street from his friend Roy Gomez in Tulare. On January 31, 2010, Dahlberg called 911 after he became concerned about a number of people he observed at Gomez's home. He had never seen these six or so men at his neighbor's home before. Gomez and the others were standing near the driveway and appeared to be talking. But then Gomez started backing up and the others were getting closer, "kind of circling around him." Dahlberg thought it was a "little suspicious." Gomez had backed up to the garage door and put his hands up. Shortly thereafter, Gomez's cousin came out from inside the house.

Although Dahlberg could not hear what was being said, he could see clearly. He focused on one person who appeared older and "darker." That individual stood out and seemed like he was telling the others what to do. He made lots of hand

---

[2] "LD" refers to the documents lodged by Respondent on October 13, 2015. (ECF No. 15).

[3] The Court relies on the California Court of Appeal's opinion, issued on October 7, 2013 and modified on November 5, 2013, for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

gestures: when he pointed to the curb, two individuals went to the curb; when he pointed to the house, everyone else went inside. That individual also used his cell phone a couple of times. The individual "was in Roy's face," while the others were behind him. Dahlberg did not witness any physical altercation.

By the time the police arrived in response to his call, Dahlberg was at the back of his house. Because he could not clearly see individual faces, he could not identify anyone other than Gomez and his cousin. Later, Gomez came to Dahlberg's door. He was "breathing hard" and was "acting shocked."

Another neighbor, Richard Hernandez, was outside working on his truck that same day. He recalled seeing "a bunch of guys" pull up in a couple of cars. He figured they were friends of Gomez's. It was not unusual until he noticed the group had Gomez backed up against the garage door. There were six or seven men, most of whom were young. Two were older and one stood out because he was the only one talking and everyone else surrounded him. Hernandez could not decide if that man was African–American or a dark complexioned Hispanic. That man was loud, "running his mouth," yelling and screaming.

Hernandez became concerned because Gomez was standing against the garage and everyone was "surrounding him." They no longer looked like friends. Although he did not talk to Gomez's cousin much, he knew who he was and he recognized him when he came outside. The group's focus then shifted to Gomez's cousin and they all went inside. About 10 minutes later, the police arrived.

When Hernandez gave his statement to police, his memory was fresh; he told the truth. He told Detective Jesus Guzman that the darker man had told Gomez's cousin, "This doesn't concern you. Get out of here." He recalled seeing the darker man on his cell phone; he wore a red hat. Gomez's cousin told the darker man that he did not have much money, but that he could take what he had. Hernandez recalled telling the detective that he saw "a larger white guy try to strike" Gomez.

In January 2010, Norteño gang member A.T. was living with his aunt, uncle, and cousin Roy Gomez in Tulare. In response to a midmorning knock, A.T. answered the door to find a man he believed to be John Delgado [who was actually Steven Delgado] asking to speak with his cousin. He knew who Delgado was because Delgado had visited Gomez in the past. A.T. noted there were other people waiting outside near a white truck and a white car, but he did not recognize the others. Gomez stepped outside with Delgado.

A.T. resumed speaking on the telephone with his girlfriend. Eventually, he heard people talking loudly or shouting. He hung up the telephone, assuming there was an argument, and went outside.

Once outside, A.T. found his cousin with his back to the garage. About seven people were encircling him. Gomez's hands were out (palms out at shoulder height) in front of him. He seemed scared and confused. Those surrounding Gomez were later identified as Wolfe, Anaya, Steven Delgado, Robert Pompa and others. Wolfe was standing "kind of offset"; A.T. had never met Wolfe but knew who he was.

Realizing the argument was about a debt he himself owed, A.T. asked what was going on. Wolfe told A.T. to mind his own business and continued to confront Gomez over the fact he "owed the homies money." Eventually, A.T. was able to tell Wolfe that it was not Gomez they were looking for, rather it was him. Wolfe

3

made a phone call. He then apologized to Gomez and pointed to A.T., saying, "You are the one." [A.T.'s debt was incurred as a result of borrowing money or drugs from the gang (then selling the drugs for profit). A.T. borrowed from the gang on two occasions, fell behind on payments, and had not repaid that debt plus "tithe" and interest.]

Anaya, who had been standing near the sidewalk, said "cops," and pointed down the street. In response to this news, everyone went inside the house. Once inside, A.T. was surrounded by Wolfe, Delgado, Pompa and another individual. Anaya and a second individual stayed at the window as lookouts. Pompa struck him in the face and he was verbally harassed. Wolfe told A.T. he owed money and began grabbing items in the house. A.T. tried to explain that the house belonged to his aunt and that the property in the home was not his. He offered to pay what he owed, and also offered the $200 he had in his possession. In the room A.T. shared with his cousin, Wolfe and Anaya were "taking things apart"; A.T. again explained most of the property belonged to his aunt. Wolfe or Delgado told him to shut up.

About this same time, the police knocked on the door. The officers had everyone exit the back room with their hands up. Identification was checked and names were taken. A.T. gave the officers a false name because he had violated his parole. Ultimately, no one was arrested and the police left. A.T. did not say anything to the police then because he had been told to shut up.

After the police left, Wolfe, who did most of the talking, told A.T. what was going to happen. Wolfe said A.T. owed $5,000, it needed to be paid, and they would be taking items with them. He was reminded that he knew "what happens" to people who do not "pay up." He would be given a phone number for "Pablo." He was to call Pablo in an hour to receive additional information about whom to pay. A.T. told Wolfe he would do his best to pay the debt. Thereafter, A.T.'s belongings were loaded into a white or cream-colored Chevrolet Blazer, including computers, printers, hard drives and keyboards. He did not give anyone permission to take the items.

After Wolfe, Anaya and the others left, A.T. called the telephone number he was given for Pablo. He recognized the voice on the other end as that of Wolfe. A.T. was told to call the number the following day about a meeting. The next day, he called Pablo's number again; Wolfe answered. Wolfe advised A.T. that he would be picked up in 30 minutes; however, a few moments later, Wolfe called back. A.T. was advised they were waiting for him outside.

A.T. went outside and got into the car as requested. Wolfe was driving, Pompa was the front seat passenger, and Delgado was in the back. They went to what A.T. assumed was Pompa's home. Pompa offered him a beer, but he declined. He was nervous and fearful. Wolfe advised him he had 29 days within which to pay back $5,000. Although A.T. had borrowed $3,000, the amount increased significantly because of "fines." A.T. asked that his belongings be returned, but Wolfe denied the request. A.T. also asked if he could have "assistance" in repaying the debt. After making a telephone call, Wolfe denied A.T.'s request for assistance.

Despite having no job or other financial resources, A.T. understood that if he did not repay the debt, he would be "done," as stated by Wolfe. A.T. understood "done" as meaning he would "be whacked" or killed. A.T. was further advised

that if he loved his kids, he would pay the money within the timeframe provided. He was then taken home.

Three or four days later, A.T. was arrested for absconding from parole and was taken to jail. Although he did not want to tell police about what had happened, and knew he was risking his life by doing so, A.T. also feared what would happen when the debt repayment deadline expired. He gave a statement to Detective Guzman and received protective custody. [Once he was released from custody, A.T. was provided with additional protection in the form of housing, utilities, and food assistance, and was provided a cell phone as well. He received that assistance between February and September 2010, but was ultimately asked to leave the program after breaking a rule.]

While serving time in jail, A.T. was transported to the Bob Wiley Detention Facility. On a bus returning from court, Wolfe was seated behind him. Wolfe told him "not to do it," and that he could fix everything, including A.T.'s status with the gang. Wolfe offered A.T. a car and some money not to say anything. A.T. did not believe him. On another occasion, as he and Detective Guzman passed Wolfe in a cell, Wolfe said, "Don't do it A[.]." That meant A.T. should not talk to the police. [Jesus Flores, a correctional deputy with the Tulare County Sheriff's Department, testified that on February 5, 2010, he was working at the main jail. He and Detective Guzman were escorting A.T. toward an interview room. As the group passed cell No. 7, Flores heard someone say, "A[.], don't do it, don't do it." Flores looked back and saw Wolfe.]

A.T. is still afraid because he still owes money. By testifying, he is considered to be "telling on" defendants and "the whole rest of the gang."

Tulare Police Officer Jeremy Faiman testified that on January 31, 2010, about 1:10 p.m., he responded in a marked K9 patrol unit to a possible home invasion in progress. As he approached the home, he observed two subjects standing out front, looking up and down the street. After calling for additional units, he contacted those subjects, who were identified as Manuel Rubio and Mario Duarte. As he directed Rubio and Duarte to sit down with their hands in sight, Roy Gomez exited the home, quickly shutting the door behind him. Gomez consented to a look around the house, indicating a couple of "homies" were inside. He was nervous.

Officer Faiman and an undercover officer approached the unlocked door. They entered and cleared the home. Several people exited a bedroom. Everyone was "really calm. It was almost a scary calm." Wolfe, Anaya, Pompa, Delgado, Jaime Rodriguez, and Adrian Vasquez were identified. Other than a legal folding pocketknife, no weapons were found on anyone located in the home. When asked for identification, A.T. provided a false name. Later, Officer Faiman learned A.T.'s true name and that he was wanted for a parole violation.

While the police were present, no one in the home said anything about a crime being committed. They said "everything was cool, they didn't need any police assistance." Officer Faiman did not notice any computer equipment, but he was not looking for it. His focus was on the people inside. The television was not on, there was no beer in view, nor was there any food being prepared or grilled at the home. Thereafter, the investigation concluded and the officers left the residence.

Roy Gomez testified that he was living with his parents and cousin in January 2010. He recalled the day the police came to the house. A couple of friends had

come over to watch football and "hang out." He could not recall everyone's name. [Later, Gomez testified that he knew who Delgado and Pompa were. He thought he knew who Mario Duarte, Manuel Rubio and Jaime Rodriguez were as well. He claimed hearing the names of the others present that day "refreshed [his] mind."] Wolfe was there; he and Wolfe would get together now and then to watch football. Gomez could not recall how often Wolfe had been to his home; he had never been to Wolfe's house. Anaya was also there, arriving with Wolfe. Gomez had been introduced to Anaya previously through a friend whose name he did not remember. There were five or six people total.

Everyone arrived at the same time because Gomez recalled hearing the doorbell. He believed he answered the door and went outside to speak with them first. Everyone greeted one another, "nothing really serious." Then, with the exception of a few people who had stayed outside to smoke, the group headed inside. They had only been sitting down and watching television for two to three minutes when the police arrived. Gomez could see through the front window when the police arrived, and he went outside to see what the problem was.

The police advised him they had been sent about "a burglary or something going on." Gomez did not want the police to go inside his home, but he did acknowledge he was on parole and thus subject to search. He told the police there was no reason for them to go inside. He sat outside on the curb while the house was searched. After the police left, the group stayed at the house "for a little bit, watched TV and stuff, you know, and then everybody took off."

His cousin A.T. had a lot of computers. A.T. tried to sell everything he had that day, and did sell a computer to Wolfe after the police left. A.T. carried the computer he sold to Wolfe out to Wolfe's white Blazer.

Gomez stated there had not been any dispute or argument that day, nor did any physical violence occur. He did not know if he talked to Detective Guzman after his cousin's arrest. At the police station, Gomez "pled the right to remain silent," so he did not give a statement. He denied telling the detective there had been a little misunderstanding and it had been straightened out and was not gang related. He did not tell Guzman he was struck or hit, nor did he tell Guzman that he did not know Wolfe. Neither did he recall telling Guzman anything about computers.

Although he used to be a gang member, Gomez was no longer a gang member because he "grew out of it." And he just "hung out" with the West Side Tulare Norteños. Gomez has three felony convictions, the last in 2005.

Jaime Rodriguez testified for the defense. In January 2010, he recalled walking on the street in Tulare on his way to see his friend Isabel. He saw two friends standing outside a house he later learned belonged to Gomez. He stopped to say hello to Manuel Rubio and Mario Duarte. They spoke for a few minutes and then Gomez invited them inside to watch the polo game and to barbeque. There were no arguments, fights, or disagreements. They watched the polo game for a few minutes before the police arrived. They had gone into a back room to smoke the marijuana Rodriguez had with him. They also looked at some computers; A.T. offered to sell the computers. The police arrived, but after checking everyone's identification, they left. Rodriguez then left because he was nervous. He was on probation and did not want to go back into custody. [On cross-examination, Rodriguez qualified the group was only discussing a barbeque. Detective Guzman testified he took Rodriguez's statement, and Rodriguez had told him there was a barbeque going on in the backyard. Rodriguez made no mention of marijuana.]

6

On February 4, 2010, Tulare police officers conducted a probation compliance check at a residence in Tulare. The officers were going to attempt to take Wolfe into custody. No one responded to the front door. Helicopter surveillance, however, noted someone leaving through the back. After a vehicle pulled out of the garage, a traffic enforcement stop was conducted on a white Chevrolet Blazer. Wolfe's girlfriend Desiree Villareal was contacted. She reported that Wolfe was at work. A subsequent probation search was conducted and numerous computer parts and equipment were located in the garage.

Detective Guzman with the Tulare County Police Department was assigned to investigate an incident involving A.T. Related thereto, on February 4, 2010, Wolfe and Anaya were taken into custody. Following *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694) warnings, Anaya gave a recorded statement. He indicated he was helping his girlfriend's uncle— Robert Pompa—pick up and load some computer equipment. He recalled carrying out a monitor and keyboard from inside a home. Anaya admitted knowing Delgado. He denied being a gang member himself, but acknowledged associating with Northerners, or Norteños.

On February 5, 2010, Detective Guzman responded to the main jail. He and Deputy Flores were walking with A.T. Passing Wolfe's cell, he heard Wolfe say, "[D]on't do it A[.], don't do it."

During the investigation Detective Guzman listened to more than 10 calls made from the Tulare County Sheriff's Department pretrial facility. He recognized the persons speaking in those phone calls as Wolfe, his girlfriend Desiree Villareal, and Wolfe's stepbrother Dexter Rabadan. Several of the recorded phone calls were played for the jury.

### Facts Relevant to the Gang Allegations

Patrick O'Donohoe is a peace officer with the City of Tulare. While on duty on November 20, 2006, O'Donohoe came into contact with Anaya. At the time, Anaya was wearing blue jeans, a gray sweatshirt, and white shoes with red shoe laces, a red belt, and a red and black '49ers beanie.

Tony Espinoza is a detective with the Tulare Police Department assigned to the gang unit. On July 16, 2009, the detective came into contact with Mario Duarte and Manuel Rubio. Duarte and Rubio, accompanied by Johnny Hernandez, were sitting on a park bench in Tulare. Duarte was photographed wearing various items of red clothing. There was writing or gang graffiti on the table in red ink, and each of the individuals had a red permanent ink marker in his possession.

On January 29, 2010, Detective Espinoza was on duty and conducted a traffic stop of a vehicle; the front license plate was not fully secured. Wolfe was the driver and Steven Delgado was the passenger. In a photo taken during the traffic stop, Wolfe was photographed wearing various items of red clothing. A few days later, on February 4, 2010, Detective Espinoza assisted with the search of a residence. The car he had pulled over a few days earlier containing Wolfe was located at the home.

Detective Guzman was designated a gang expert. He estimated there were over 400 active gang members in Tulare. He described the formation of the Norteño gang and the signs and symbols related to the gang. The gang's activities included assaults, assaults with a deadly weapon, robberies, drug sales, and weapons

possession. Guzman also testified to predicate offenses, gang packets, and the gang modules at the Bob Wiley Detention Facility.

In Detective Guzman's opinion, Wolfe is an active "Northerner" gang member and was on January 31, 2010. His opinion is based upon police reports, arrests, contacts, jail housing assignments, and information known to the department.

It is also the detective's opinion that Anaya is an active Northerner gang member and was on January 31, 2010. Guzman's opinion is based on the fact he asked Anaya if he was a gang member and Anaya responded, " 'I guess so.' " His opinion is also based on Anaya's jail housing assignment and the fact that San Francisco '49ers clothing is typically worn as a symbol of the Northern gang.

Detective Guzman was also of the opinion that Delgado, Pompa, Duarte, Rubio and Rodriguez were all active gang members. Further, the detective believed A.T. was a gang member until January 31, 2010. He was no longer a gang member because he failed to pay his debt and because A.T. was considered a "rat" for telling the police about a crime committed by a fellow gang member.

Presented with a hypothetical situation involving similar facts, Detective Guzman believed the type of crimes alleged to have been committed would have been committed at the direction of and for the benefit of the Norteño criminal street gang. Additionally, those crimes would have been committed in association with the Norteño criminal street gang and furthered its objectives.

Defense expert Albert Ochoa, a behavioral interventionist, worked at a charter school in Visalia. He met with students, including those involved in gangs, every day. His past experience as executive director of a community center and mental health specialist at a youth services agency also put him in contact with young people involved in gangs, either as members or as associates. Ochoa has a certificate in basic counseling and psychology from La Puente Bible College. He is regularly contacted regarding his opinion on gang issues and has been previously certified as a gang expert in Tulare County.

Following his interviews with Wolfe and Anaya, and his review of the materials provided by Wolfe's attorney, Ochoa concluded that Wolfe and Anaya associate with the gang. In his opinion, they are not active gang members.

On cross-examination, Ochoa indicated that a photograph of Anaya wearing items of red clothing, taken during a 2006 contact with law enforcement, would not change his opinion that Anaya was not a gang member because the photo was six years old. Ochoa indicated he had not listened to the phone call between Wolfe and his half brother so that fact was not considered for purposes of his opinion. Ochoa acknowledged that he is paid to testify. He further acknowledged that were he to have found Wolfe and Anaya to be active gang members, he would not have been paid. Ochoa could not opine as to whether Delgado, Pompa and the others were gang members because he did not interview them. Ochoa agreed that an associate of the gang does not "call shots." He further agreed that if someone "pleads to a crime" and admits a related gang enhancement, he would opine that individual is an active gang member.

(ECF No. 14 at 59–69).

**III.**

**STANDARD OF REVIEW**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously

or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. <u>Id.</u> If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." <u>Id.</u> at 99–100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98. This court "must

determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Jury Instructions

#### 1. Witness Credibility

In his first claim for relief, Petitioner asserts that the trial court violated his rights to due process and jury assessment of the credibility of witnesses by instructing the jury with an inapplicable portion of a witness credibility instruction. (ECF No. 1 at 5). Respondent argues that at the time Petitioner's conviction became final, there was no clearly established federal law holding that such an instruction violated Petitioner's due process rights. Further, assuming *arguendo* that there was a due process violation, the state court reasonably determined that any instruction error was harmless under Chapman v. California, 386 U.S. 18, 24 (1967). (ECF No. 14 at 24–25).

This claim was presented on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in the petition for review, which the California Supreme Court summarily denied. The Court presumes that the California Supreme court adjudicated the claim on the merits. See Richter, 562 U.S. at 99. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst, 501 U.S. at 806.

In denying Petitioner's claim regarding the witness credibility instruction, the California Court of Appeal stated:

> Defendants contend the trial court erred when it instructed the jury with a portion of CALCRIM No. 226 that was inapplicable and, as a result, their rights to due process and the right to a jury assessment of the credibility of witnesses have been violated. Further, they assert the error was not harmless.

### A. Applicable Standards

> "'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.)

> "In reviewing the purportedly erroneous instructions, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.] In conducting this inquiry, we are mindful that "'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 957, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

We consider the instructions as a whole, along with the jury's findings and the closing arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 36; *People v. Eid* (2010) 187 Cal.App.4th 859, 883.) We will find error only if it is reasonably likely the instructions as a whole caused the jury to misunderstand the applicable law. (*Estelle v. McGuire* (1991) 502 U.S. 62, 74; *People v. Kelly* (1992) 1 Cal.4th 495, 525-527.)

### B. The Language of CALCRIM No. 226

The jury was instructed with CALCRIM No. 226 as follows:

> "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate use your common sense and experience. You must judge the testimony of each witness by the same standards setting aside any bias or prejudice you may have. You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

> "In evaluating a witness's testimony you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: How well could the witness, see, hear, or otherwise perceive the things about which the witness testified.

> "How well was the witness able to remember and describe what happened?

"What was the witness's behavior while testifying?

"Did the witness understand the questions and answer them directly?

"Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with some one involved in the case or a personal interest in how the case is decided?

"What was the witness's attitude about the case or about testifying?

"Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

"How reasonable is the testimony when you consider all the other evidence in the case? Did other evidence prove or disprove any fact upon which the witness testified?

"Did the witness admit to being untruthful? Has the witness been convicted of a felony?

"Was the witness promised immunity or leniency in exchange for his testimony?
"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember.

"Also, 2 people may witness the same event yet see or hear it differently. If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her you may conclude from a lack of discussion that the witness's character for truthfulness is good.

"If you do not believe a witness's testimony that he or she no longer remembers something that testimony is inconsistent with the witness's earlier statement on that subject. If you decide that a witness deliberately lied about something significant in this case you should consider not believing anything that witness says. Or, if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

### C. Analysis

CALCRIM No. 226 instructs the jury on factors that it may consider in judging the credibility of a witness. We agree the trial court read to the jury an inapplicable portion of the instruction concerning character evidence: "If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her you may conclude from a lack of discussion that the witness's character for truthfulness is good." This portion of the instruction was simply not relevant or applicable in light of the testimony at trial. "It is error for a court to give an 'abstract' instruction, i.e., 'one which is

correct in law but irrelevant[.]' [Citation.]" (*People v. Rowland* (1992) 4 Cal.4th 238, 282.) Indeed, the Bench Notes to CALCRIM No. 226 instruct that the challenged language should be given only "if relevant based on the evidence." The challenged portion of the instruction, addressing circumstances in which the jury could assume good character for truthfulness from the absence of a discussion among character witnesses about the witness's character for honesty, was irrelevant because no evidence supported it. Thus, the court erred in giving it.

However, this error did not prejudice defendants. We look to other instructions given to the jury in assessing prejudice. (*People v. Sanders* (1995) 11 Cal.4th 475, 536-537.) Here, the jurors were thoroughly instructed on how to evaluate the testimony of witnesses, which in addition to CALCRIM No. 226 included the following: CALCRIM Nos. 301 (Single Witness's Testimony), 302 (Evaluating Conflicting Evidence), 316 (Additional Instructions on Witness Credibility—Other Conduct), 318 (Prior Statements as Evidence), 332 (Expert Witness Testimony) and 333 (Opinion Testimony of Lay Witness). Significantly, too, the jury was instructed with CALCRIM No. 200, which provided in pertinent part: "Some of these instructions may not apply, depending on your findings about the facts of the case. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Thus, it is most likely the jury ignored the challenged portion of the instruction after correctly determining it was not relevant or applicable. (*People v. Gonzales*, *supra*, 51 Cal.4th at p. 940.) Additionally, as the Attorney General argues, the challenged language applied to all witnesses, not just the victim. Given the number of credibility factors and instructions, nothing suggests the verdicts obtained here were the result of any consideration of the challenged language. Notably too, neither party mentioned nor emphasized the challenged language in closing arguments to the jury, further reducing the likelihood of prejudice.

We find it is not reasonably likely the instructions as a whole caused the jury to misunderstand the applicable law. (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 74; *People v. Kelly*, *supra*, 1 Cal.4th at pp. 525-527.) In sum, the error was harmless under either the state or federal constitutional standard of error. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

(ECF No. 14 at 69–73).

Here, the California Court of Appeal found that the trial court erred under state law by instructing the jury with an irrelevant portion of CALCRIM No. 226, but that the error was harmless under the federal constitutional standard set forth in Chapman. (ECF No. 14 at 73). The Supreme Court has held that when a state court's "Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is, Petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Id. (internal

1  quotation marks omitted) (quoting <u>Richter</u>, 562 U.S. at 103).

2       Under <u>Chapman</u>, "the test for determining whether a constitutional error is harmless . . .

3  is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute

4  to the verdict obtained.'" <u>Neder v. United States</u>, 527 U.S. 1, 15 (1999) (quoting <u>Chapman</u>, 386

5  U.S. at 24).   The California Court of Appeal's decision is not an unreasonable application of

6  <u>Chapman</u>.  The state court considered the challenged portion of the CALCRIM No. 226

7  instruction in the context of the jury instructions as a whole. The state court noted that the jury

8  was given multiple instructions on how to evaluate the testimony of witnesses in addition to

9  CALCRIM No. 200, which provides in pertinent part: "Some of these instructions may not

10  apply, depending on your findings about the facts of the case. After you have decided what the

11  facts are, follow the instructions that do apply to the facts as you find them." Thus, the court

12  reasonably concluded that the jury most likely ignored the challenged portion of the instruction

13  since it was irrelevant. The California Court of Appeal's <u>Chapman</u> decision is not "so lacking in

14  justification that there was an error well understood and comprehended in existing law beyond

15  any possibility of fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is

16  not entitled to habeas relief on his first claim and it must be denied.

17       2.  <u>False Statement</u>

18       In his second claim for relief, Petitioner asserts that the trial court violated his rights to

19  due process and jury assessment of the facts by instructing the jury with an inapplicable

20  instruction regarding false or misleading statements and consciousness of guilt. (ECF No. 1 at 9).

21  Respondent argues that this claim is procedurally defaulted. (ECF No. 14 at 30). Moreover, on

22  the merits, Respondent contends that a fairminded jurist possibly could find no basis to hold that

23  the inclusion of an arguably irrelevant instruction violates the Constitution. (<u>Id.</u> at 32–33).

24       This claim was not raised on direct appeal. Petitioner first raised this claim in his state

25  habeas petition in the California Supreme Court. (LD 29). The California Supreme Court

26  summarily denied Petitioner's habeas petition, citing to <u>In re Dixon</u>, 41 Cal. 2d 756, 759 (1953).

27  (LD 30).

28

1              **a. Procedural Default**

2          A federal court will not review a petitioner's claims if the state court has denied relief on

3  those claims pursuant to a state law procedural ground that is independent of federal law and

4  adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This

5  doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32.

6  However, there are limitations as to when a federal court should invoke procedural default and

7  refuse to review a claim because a petitioner violated a state's procedural rules. Procedural

8  default can only block a claim in federal court if the state court "clearly and expressly states that

9  its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

10         Here, the California Supreme Court summarily denied Petitioner's habeas petition with a

11  citation to In re Dixon, 41 Cal. 2d 756, 759 (1953). (LD 30). Under the Dixon rule, a petitioner

12  cannot raise a claim in a post-appeal habeas petition when that claim was not, but could have

13  been, raised on direct appeal. Dixon, 41 Cal. 2d at 759. As the California Supreme Court clearly

14  and expressly stated that its judgment rests on a state procedural bar, procedural default is

15  appropriate if the Dixon rule is independent and adequate.

16         To qualify as "independent," a state procedural ground "must not be 'interwoven with the

17  federal law.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v.

18  Long, 463 U.S. 1032, 1040–41 (1983)). Prior to In re Robbins, 18 Cal. 4th 770 (1998), denials of

19  California state habeas petitions for Dixon violations were not independent of federal law. Park,

20  202 F.3d at 1152. Although the Ninth Circuit has not explicitly held that post-Robbins denials

21  for Dixon violations are independent, the Ninth Circuit has noted that "[t]he California Supreme

22  Court has adopted in Robbins a stance from which it will now decline to consider federal law

23  when deciding whether claims are procedurally defaulted. . . . The purpose of this approach was

24  to establish the adequacy and independence of the State Supreme Court's future Dixon/Robbins

25  rulings . . . ." Park, 202 F.3d at 1152 & n.4. Relying on the on the Dixon/Robbins analysis in

26  Park, the Ninth Circuit subsequently held that the California Supreme Court's denial of a state

27  habeas petition for untimeliness based on Robbins and In re Clark, 5 Cal. 4th 750 (1993), is an

28  independent procedural ground. Bennett v. Mueller, 322 F.3d 573, 582 (9th Cir. 2003). Pursuant

1   to Park and Bennett, the Court finds that the California Supreme Court's post-Robbins denial of

2   Petitioner's state habeas petition for a Dixon violation is an independent state procedural ground.

3        "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established

4   and regularly followed.'" Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Beard v. Kindler,

5   558 U.S. 53, 60 (2009)). That is, the state procedural bar must be "clear, consistently applied,

6   and well-established at the time of the petitioner's purported default." Lee v. Jacquez, 788 F.3d

7   1124, 1128 (9th Cir. 2015) (internal quotation marks omitted) (quoting Collier v. Bayer, 408

8   F.3d 1279, 1284 (9th Cir. 2005)). The Ninth Circuit has taken a burden-shifting approach to

9   determining the adequacy of a state procedural ground. See Bennett, 322 F.3d at 586. First, the

10  state must plead an independent and adequate state procedural bar as an affirmative defense. The

11  burden then shifts to the petitioner "to place that defense in issue." Id. The petitioner's burden is

12  "modest," Lee, 788 F.3d at 1128, and can be satisfied by "asserting specific factual allegations

13  that demonstrate the inadequacy of the state procedure, including citation to authority

14  demonstrating inconsistent application of the rule," Bennett, 322 F.3d at 586. If the petitioner

15  satisfies his burden, the burden shifts back to the state, which bears "the ultimate burden of

16  proving the adequacy" of the state procedural bar. Id. at 585–86. In the instant case, Petitioner

17  has not raised any challenges to the adequacy of the Dixon rule. Accordingly, as Petitioner has

18  not met his burden, the Court finds that the California Supreme Court's post-Robbins denial of

19  Petitioner's state habeas petition for a Dixon violation is an adequate state procedural ground.

20       Based on the foregoing, the Court finds that the California Supreme Court expressly

21  invoked an independent and adequate procedural rule in California, commonly referred to as the

22  Dixon rule, and Petitioner has procedurally defaulted this claim. A petitioner "may obtain federal

23  review of a defaulted claim by showing cause for the default and prejudice from a violation of

24  federal law." Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012) (citing Coleman, 501 U.S. at 750).

25  Attorney error on direct appeal constituting ineffective assistance of counsel provides "cause" to

26  excuse procedural default. Martinez, 132 S. Ct. at 1317; Coleman, 501 U.S. at 754. However, a

27  claim of ineffective assistance generally must "be presented to the state courts as an independent

28  claim before it may be used to establish cause for a procedural default." Murray v. Carrier, 477

U.S. 478, 489 (1986). Here, Petitioner states that ineffective assistance of appellate counsel caused the default, but he has not presented an independent ineffective assistance claim to the state courts. (ECF No. 1 at 9; LD 29). As Petitioner has failed to establish cause and prejudice for his default, the Court finds that Petitioner is procedurally barred from bringing this claim and it should be dismissed. In any case, Petitioner's claim is without merit.

### b.  Merits

Petitioner simultaneously contends that "there was no evidence present in the record to support the giving of this instruction" and that "it is undeniable that the jury instruction outlined in CALCRIM 362 did apply, given the fact that Petitioner did give a statement prior to trial proceedings." (ECF No. 1 at 10). The Court construes Petitioner's claim as asserting that the instruction was ambiguous and that the jury applied the challenged instruction in an unconstitutional manner. See Allen v. Calderon, 408 F.3d 1150, 1153 (9th Cir. 2005) ("[T]he district court must construe pro se habeas filings liberally.").

A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Middleton v. McNeil, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id. The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (internal quotation marks omitted) (quoting Cupp, 414 U.S. at 147). In reviewing an ambiguous instruction, the Court "inquire[s] 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Id. (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).

The challenged instruction was given to the jury as follows:

> If defendant ERIC THOMAS WOLFE and ADAM DANIEL ANAYA made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. You may not consider the statement in deciding any other defendant's guilt.

> If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself.

(3 CT[4] 786). The instruction explicitly states "if defendant . . . made a false or misleading statement before this trial" and "[i]f you conclude that the defendant made the statement . . ." Thus, the challenged instruction makes clear that it is only applicable *if* the jury finds that Petitioner made a false or misleading statement before trial. Further, as discussed above, the jury was instructed with CALCRIM No. 200, which provides in pertinent part: "Some of these instructions may not apply, depending on your findings about the facts of the case. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Moreover, to safeguard against potential misapplication of the challenged instruction, the trial court advised the jury in the same instruction that "evidence that the defendant made such a statement cannot prove guilt by itself." Given these limiting provisions in the instruction, the Court finds that there is not a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. See Estelle, 502 U.S. at 74–75. Petitioner fails to demonstrate how the challenged instruction "by itself so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147.

## B. Extortion Conviction

In Petitioner's third claim for relief, Petitioner challenges his extortion conviction on multiple grounds. Petitioner contends that there was insufficient evidence to support his extortion conviction. (ECF No. 1 at 12). Petitioner also contends that he was erroneously convicted of both extortion and robbery, citing to Brown v. Ohio, 432 U.S. 161 (1977) (involving a double jeopardy claim), and People v. Bailey, 55 Cal. 2d 514, 519 (1961) (recognizing, in the context of theft, that a series of wrongful acts may be aggregated to constitute one offense if they are

---

[4] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on October 13, 2015. (ECF No. 15).

1   committed pursuant to "one intention, one general impulse, and one plan"). (ECF No. 1 at 14).

2   Respondent argues that under the deferential standard exercised on federal habeas review, the

3   state court's decision to affirm the extortion conviction "cannot be second-guessed." (ECF No.

4   14 at 40). To the extent that Petitioner challenges the state court's application of the <u>Bailey</u>

5   doctrine, Respondent argues that a claimed violation of state law is not cognizable on federal

6   habeas review. (<u>Id.</u>).

7        This claim was presented on direct appeal to the California Court of Appeal, Fifth

8   Appellate District, which denied the claim in a reasoned decision. However, this claim was not

9   fairly presented to the California Supreme Court either in the petition for review on direct appeal

10  or in the state habeas petition, (LDs 26, 29), and thus, implicates exhaustion concerns.[5] However,

11  pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits

12  "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim."

13  <u>Cassett v. Stewart</u>, 406 F.3d 614, 624 (9th Cir. 2005) (adopting the standard set forth in

14  <u>Granberry v. Greer</u>, 481 U.S. 129, 135 (1987)).

15       To the extent that Petitioner argues that pursuant to <u>Bailey</u> he should have been convicted

16  of only one offense rather than convicted of both extortion and robbery, this is an issue of

17  California state law that is not cognizable in federal habeas proceedings. <u>See</u> <u>Wilson v.</u>

18  <u>Corcoran</u>, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that

19  renders a State's criminal judgment susceptible to collateral attack in the federal courts.");

20  <u>Estelle</u>, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-

21  court determinations on state-law questions.").

22       1.  <u>Double Jeopardy</u>

23       The established test for determining what constitutes the "same offence" under the

24  Double Jeopardy Clause was set forth by the Supreme Court in <u>Blockburger v. United States</u>,

25

26  _____
    [5] A petitioner in state custody who is proceeding with a petition for writ of habeas corpus generally must exhaust
    state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and

27  gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. <u>Coleman</u>, 501
    U.S. at 731; <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982). If Petitioner has not sought relief in the California Supreme
    Court for the claims that he raises in the instant petition, the Court cannot proceed to the merits of those claims. 28

28  U.S.C. § 2254(b)(1); <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).

1  284 U.S. 299, 304 (1932): "The applicable rule is that where the same act or transaction

2  constitutes a violation of two distinct statutory provisions, the test to be applied to determine

3  whether there are two offenses or only one, is whether each provision requires proof of an

4  additional fact which the other does not." The <u>Blockburger</u> test is satisfied if each statutory

5  provision "requires proof of a fact that the other does not . . . notwithstanding a substantial

6  overlap in the proof offered to establish the crimes." <u>Brown</u>, 432 U.S. at 166 (internal quotation

7  marks omitted) (quoting <u>Iannelli v. United States</u>, 420 U.S. 770, 785 n.17 (1975)).

8      The California Penal Code defines extortion as "the obtaining of property from another,

9  with his consent . . . induced by a wrongful use of force or fear." Cal. Penal Code § 518. Robbery

10  is defined as "the felonious taking of personal property in the possession of another, from his

11  person or immediate presence, and against his will, accomplished by means of force or fear."

12  Cal. Penal Code § 211. The California courts have articulated the following distinctions between

13  extortion and robbery under California law:

> One distinction between robbery and extortion frequently noted by
> courts and commentators is that in robbery property is taken from
> another by force or fear "against his will" while in extortion
> property is taken from another by force or fear "with his consent."
> The two crimes, however, have other distinctions. Robbery
> requires a "felonious taking" which means a specific intent to
> permanently deprive the victim of the property. Robbery also
> requires the property be taken from the victim's "person or
> immediate presence." Extortion does not require proof of either of
> these elements. Extortion does, however, require the specific intent
> of inducing the victim to consent to part with his or her property.

20  <u>People v. Torres</u>, 33 Cal. App. 4th 37, 50 (Cal. Ct. App. 1995) (citations and footnote omitted).

21  Based on the foregoing, the <u>Blockburger</u> test is satisfied because extortion under California Penal

22  Code section 518 and robbery under section 211 each require proof of a fact that the other does

23  not. As it is "perfectly clear" that Petitioner does not raise a colorable double jeopardy claim

24  with respect to his extortion and robbery convictions, the Court may deny this claim on the

25  merits pursuant to 28 U.S.C. § 2254(b)(2).

26      2.  <u>Sufficiency of the Evidence</u>

27      The United States Supreme Court has held that when reviewing a sufficiency of the

28  evidence claim, a court must determine whether, viewing the evidence and the inferences to be

drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (quoting Jackson, 443 U.S. at 319).

Petitioner argues that there is insufficient evidence to prove that the victim, A.T., "consented to giving his money because he testified that he had no choice." (ECF No. 1 at 15). As stated above, the California Penal Code provides that "[e]xtortion is the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear." Cal. Penal Code § 518. Recognizing the "paradox of a taking which is both consensual *and* the result of force or fear," Torres, 33 Cal. App. 4th at 50 n.6, California courts have stated that "[t]o constitute extortion the victim must consent, albeit it is a coerced and unwilling consent," People v. Goodman, 159 Cal. App. 2d 54, 61 (Cal. Ct. App. 1958). See also People v. Goldstein, 84 Cal. App. 2d 581, 586 (1948) ("The victim of an extortioner might openly consent to the taking of his money 'and yet protest in his own heart' against its being taken." (quoting People v. Peck, 43 Cal. App. 638, 645 (Cal. Ct. App. 1919))).

At trial, A.T. testified regarding the money and property taken from him as follows:

> [PROSECUTOR:] Q. All right. And what happened once you enter the living room?
>
> [A.T.:] A. Well once we enter the living room I believe it is Anaya and another individual stayed at the window looking out the window while I got encircled inside by Mr. Wolfe, Delgado, Pompa and another individual, I don't remember his name or actually I don't recall him at all. Even knowing it. I got in the circle there, then I was hit in the face.
>
> . . .
>
> Q. Okay. Now let's back up because that was a lot of information.

23

1      So you get punched, some of the guys in there are saying get back
in the circle and Mr. Wolfe says round everything up, this guy
2      owes money and he is pointing at you pretty much?

3      A. Yeah.

4      Q. Well obviously. How, was that right after the punch pretty
much?
5

      A. Yeah, yeah.
6

7      Q. Okay. And do people start going and taking property at that
point?

8      A. Yes.

9      Q. Do they start going through the house?

10      A. Yes.

11      Q. Okay. And did you have any property at the house?

12      A. Some, yes.

13      Q. Okay. And but most would it be fair to say that most of the
items in there were your aunt's and your uncle's?
14      A. Yes, her house, it is her house, of course.

15      Q. Now did you have any money on you as well?

16      A. Yes.

17      Q. And if you recall approximately how much money?

18      A. I believe it was 200? 200 something.

19      Q. 200 some dollars?

20      A. Yes.

21      Q. Did you try to give that money to them?

22      A. Yes.

23      Q. Now was that taken from you or did you hand it over?

24      A. It was taken. It was handed over.

25      Q. All right. You handed it over?

26      A. Yes.

27      Q. Did you feel at that moment that you had any choice?

28      A. No. No.

(3 RT[6] 107–08, 111–12).

Viewing the record in the light most favorable to the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that Petitioner committed extortion. The trial testimony revealed that soon after A.T. was encircled by Petitioner and his associates and punched in the face, A.T. handed over approximately $200 because he felt that at that moment he had no choice. On the basis of A.T.'s testimony and presuming all inferences were made in favor of the prosecution, a rational trier of fact could find that A.T. consented to the taking of the money, albeit it was a coerced and unwilling consent. Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam). Under this deferential standard of judicial review, the Court finds that a rational trier of fact could find the essential elements of extortion beyond a reasonable doubt. As it is "perfectly clear" that Petitioner does not raise a colorable federal due process claim with respect to the sufficiency of the evidence supporting his extortion conviction, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

**C. Juror Misconduct**

In his fourth claim for relief, Petitioner asserts that the trial court violated his right to a fair and impartial jury by not granting a mistrial or excusing a juror who expressed to her father and other jurors her fears arising from the purported actions of an audience member. (ECF No. 1 at 16). Respondent argues that under AEDPA's deferential standard of review, the state court reasonably denied Petitioner's claim. (ECF No. 14 at 52–53).

This claim was presented on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in the petition for review, which the California Supreme Court summarily denied. The Court presumes that the California Supreme court adjudicated the claim on the merits. See Richter, 562 U.S. at 99. The Court reviews the last reasoned state court opinion. See Brumfield, 135 S. Ct. at

---

[6] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on October 13, 2015. (ECF No. 15).

1   2276; <u>Ylst</u>, 501 U.S. at 806.

2       In denying Petitioner's juror misconduct claim, the California Court of Appeal stated:

3       Defendants contend the judgments must be reversed because a juror engaged in
        prejudicial misconduct. More specifically, defendants assert the juror committed
4       misconduct by speaking to her father about fear she experienced as a result of the
        purported actions of an audience member, and by discussing same with her fellow
5       jurors. The People assert there was no misconduct and that, in any event, there
        was no substantial likelihood any juror was biased against defendants.

6
        ***A. The Relevant Background***
7
        On the fourth day of trial, the court convened in chambers to discuss an issue
8       brought to its attention regarding a juror. The trial court explained that another
        judge was approached by a friend who advised his daughter was serving as a juror
9       on a gang case. The individual relayed that his daughter was afraid or fearful
        because a female audience member watched her as she took notes. The court was
10      not certain the juror was in fact seated on its particular jury, but sought feedback
        from counsel. The prosecutor volunteered that he was aware the action was "the
11      only gang trial" ongoing; counsel for defendant Wolfe, Mr. Reyes, was of a
        similar understanding. Thus, it was suggested an inquiry be made of the juror
12      regarding her fear and the communication of that fear. The court agreed to do so
        after noting it had not witnessed any inappropriate behavior on the part of any
13      audience member. Specifically, the court noted the presence of a female audience
        member—later determined to be the mother of defendant Wolfe's girlfriend—
14      who "simply sat there and watched the proceedings."

15      Thereafter, Juror 104 was questioned as follows:

16          "JUROR 104: I am 30 years old and my dad is still calling people
            isn't he?
17
            "THE COURT: Good morning to you.
18
            "JUROR 104: Good morning.
19
            "THE COURT: We are all convened and out of the presence of the
20          jury panel except for juror number 104. All 3 lawyers in this case
            are present along with court staff.
21
            "First and foremost we are not here to punish you or embarrass you
22          in any way, I want to make sure you understand that.

23          "JUROR 104: Uh-huh.

24          "THE COURT: But by your comment as you come through the door
            I think you have some idea why I have to talk to you.
25
            "JUROR 104: Uh-huh, yeah.
26
            "THE COURT: It has been reported to me through a channel that
27          perhaps through and if the persons are wrong you are going to
            correct me, a father in law or a father.
28

26

1    "JUROR 104: Father.

2    "THE COURT: Indicated that you spoke with him.

3    "JUROR 104: Uh-huh.

4    "THE COURT: Regarding, I am going to say what I heard.

5    "JUROR 104: Okay.

6    "THE COURT: That you are feeling fearful in this case because you
     believe some one in the audience is staring at you while taking
7    notes.

8    "JUROR 104: Uh-huh.

9    "THE COURT: And that's the end and all of what I heard.

10   "JUROR 104: Uh-huh. I just wasn't sure if—

11   "THE COURT: Let me real quick. So first of all I want to confirm
     that you did make that comment to a relative, is that correct?
12
     "JUROR 104: Uh-huh, my father.
13
     "THE COURT: Your father?
14
     "JUROR 104: Yes.
15
     "THE COURT: Did you say anything else to him?
16
     "JUROR 104: No.
17
     "THE COURT: All right. Did you talk to him about the facts of the
18   case?

19   "JUROR 104: No.

20   "THE COURT: Did you discuss it with anybody else except your
     father?
21
     "JUROR 104: My husband and my father were there.
22
     "THE COURT: Okay. Did you express that sentiment to any other
23   juror members?

24   "JUROR 104: No, it has been discussed in there that that feeling of
     feeling threatened or you know, nervous being in the situation,
25   being the type of case that it is, just, and the one particular
     audience member, you know, we have all noticed.
26
     "THE COURT: Who is the person that you—
27
     "JUROR 104: It is a lady, she was in an orange shirt yesterday, long
28   hair, there was only a lady and a gentleman.

"THE COURT: And what do you believe she is doing?

"JUROR 104: I have no idea because I don't know if she is part of a gang or—

"THE COURT: No. No, but you indicated you were fearful because she is doing something.

"JUROR 104: Just staring to me, to me she is like, okay is she going to—I am going to cry, I don't even want to be in here. I just feel like maybe—

"THE COURT: You know what, you are doing marvelously well. We will get you some Kleenex.

"JUROR 104: I don't want her to be telling somebody else or there is a girl in a blue and white dress and, you know, follow her or you know, whatever else. It is just scary any time you are dealing with something like that.

"THE COURT: Okay. I will say it again, you have done nothing wrong, okay?

"JUROR 104: Uh-huh.
"THE COURT: I need to ask you, a couple of things come to mind based upon your statements. You say that several other members of the jury have expressed similar sentiment, is that correct?

"JUROR 104: Uh-huh, just a nervousness of the case and it, you know, not knowing if we are being, you are going to be watched or whatever else, you know what I mean?

"THE COURT: Yes. And have they expressed the same sentiment with respect to somebody in the audience or related to the defendant in the case?

"JUROR 104: No. Audience.

"THE COURT: Anybody else besides that woman?

"JUROR 104: Another person said that the gentleman, I didn't ever pay attention to the man because to me he was always looking forward, but the lady, I felt like every time I looked up her eyes were just right in the juror box, you know, paying attention to us.

"THE COURT: The only word I know is dogging, do you feel like she is dogging you?

"JUROR 104: Yes. I mean in a sense it was rude to me, I thought she was loaded out of her mind, you know, so just, I felt very uncomfortable.

"THE COURT: And other jurors have expressed the same?

28

"JUROR 104: Uh-huh.

"THE COURT: I am not calling you back in here to—

"JUROR 104: I want you to know that I am enjoying this, like when my dad, called him, today I called him, but I mean I am doing it but there is just that aspect of the case.

"THE COURT: All right. I am not going to ask you to rat out any individual members but I need to know. You have said generally several people have expressed that.

"JUROR 104: Uh-huh.

"THE COURT: Approximately how many?

"JUROR 104: I would say 2 or 3. I mean other people have maybe talked off of it but 2 or 3 have directly.

"THE COURT: So you would say several?

"JUROR 104: Uh-huh.

"THE COURT: I need to ask you is there anything about the trial, is there anything about the attorneys' conduct or what they have said, is there anything about the way that the case has been conducted, setting aside this woman.

"JUROR 104: Uh-huh.

"THE COURT: That is causing you to be fearful?

"JUROR 104: Not at all.

"THE COURT: So nothing else at all.

"JUROR 104: No.

"THE COURT: And whether any reports or any comments made to your knowledge by anybody else in the jury panel when you are talking or otherwise that related a fear or concern outside this woman that you have identified?

"JUROR 104: No, I think just seeing that, the woman in there and the man, it makes them fearful that then you know that they could be following us or something like that, we know that the defendants and the other people are on lock down. I don't know that but, you know what I mean, that they are watched and I am not afraid of them. I am not. To me those people walk out the same time I may walk out and you know, I mean I walked around before I walked to my car and you know, I don't want any of that.

"THE COURT: All right. If I will assure you and assure everybody in the jury that we will take extra precautions to make sure that you will not have contact with people in the audience who you believe,

I have no idea who this woman is. Oh, that is not true. I have an idea now because one of the attorneys suggested they may know who that person is.

"JUROR 104: Uh-huh.

"THE COURT: But so that you will not have contact with anybody in the audience when you come into and leave court on recess or otherwise, but you believe that would make you feel more comfortable.

"JUROR 104: Yeah, because there is no way to insure that that person can't be, because it is open to the public, right?

"THE COURT: Sure.

"JUROR 104: That is where you are just screwed, I mean I don't know.

"THE COURT: I have to say something. I have asked questions, I'm going to say something. I guess I am the only person whose got a straight on view of the audience and although my attention is appropriately and properly focused on the witnesses or the lawyers, I look up at the audience dozens of times. I have not seen anybody act or say or do anything inappropriate.
"JUROR 104: Uh-huh.

"THE COURT: My job is to call that immediately and I would get on somebody immediately even if I felt there was the hint of that.

"JUROR 104: Uh-huh.

"THE COURT: And I haven't seen anything so I want to assure you it is not like I am oblivious to that or that is not something that I am always concerned about in any case.

"JUROR 104: Uh-huh.

"THE COURT: I also will recommunicate with you what I did in the jury panel initially that there is nothing specific about this case that is different than a case we did last week and the case we did next week, somebody is charged with crimes.

"JUROR 104: Uh-huh.

"THE COURT: And this is the process that we used and if I felt otherwise I would be up front with everybody. I would not want you to be in a situation different than a friend of mine or a relative or otherwise, and I want you to hear that from me. Okay?

"JUROR 104: Okay.

"THE COURT: Counsel, are there any questions that you would like me to address with juror number 104 before she is excused back to the jury room?

"MR. REYES: No, Your Honor[.]

"THE COURT: Mr. Meyer.

"MR. MEYER: No, Your Honor.

"THE COURT: Mr. Bartlett?

"MR. BARTLETT: No. Thank you.

"THE COURT: Thank you ma'am. Thank you for your honesty.

"JUROR 104: Uh-huh.

"(Juror 104 leaves chambers.)

"THE COURT: We remain on the record. Gentlemen, any comments?

"MR. BARTLETT: I feel that I need to discuss this with my client. I would like to just take a 2 to 5-minute break. Let him—

"THE COURT: You know what I should have said? Could you have her come back here again? I need to tell her not to talk about what we just talked about.

"[PROSECUTOR]: Can we have a discussion off the record?

"(Juror 104 returns to chambers.)

"JUROR 104: I was going to let you know she is out there today, just far left.

"THE COURT: All right. I am supposed to tell you please do not, remember the admonition, please do not discuss this conversation with any other members of the jury.

"JUROR 104: Okay.

"THE COURT: Thank you.

"JUROR 104: You got what I said?

"THE COURT: I did.
"(Juror 104 leaves chambers.)

"THE COURT: Do you want to go off the record, gentlemen?

"[PROSECUTOR]: Yeah.

"(Discussion held off the record.)"

The court then broadened its inquiry by questioning each remaining juror separately. Juror Nos. 122, 35, 110, 107, 27, 116, 46, 132, 11, 120 and 124

indicated they were not fearful and that nothing had happened during the trial to cause them fear. Some had heard other jurors discuss concerns about an audience member staring at the jury. Others had not personally perceived such action by the audience member. Each one indicated he or she could remain fair and impartial. Juror No. 18 admitted being a little unnerved by a woman in the audience who was staring the day prior, but indicated she could be fair and impartial. Juror No. 123 indicated that a spectator caused her to be fearful because the spectator "intensely watch[ed]—the jury." She was uncomfortable because she felt she was being stared at. She did not discuss her fear with others, but had overheard other jury members expressing their concerns. Despite being a little nervous, she believed she could be fair and impartial. Juror No. 27 understood another juror's concern to involve her fear walking to a ballgame, and agreed with the trial court that the fear was the result of "her attention perhaps is heightened because of what's going on here …."

Once the jurors were excused, the court noted it had "voir dired each and every member of the jury panel and the 2 remaining alternates. Each and every member of the jury panel after discussion has fully and freely represented that they remain and are still able to be a fair and impartial jurors [*sic*] in this case and render a decision according to the instructions and the law …." The court was of the opinion that "nothing has transpired in this case that has sacrificed the due process, procedural, statutory and other constitutional rights" of defendants. It then invited comment from counsel. At the request of counsel for defendant Anaya and with the stipulation of counsel for defendant Wolfe and the People, an unreported discussion was held in chambers. When proceedings resumed, the jury was present. The issue was briefly noted before the jury was released on noon recess. Shortly thereafter, counsel for defendant Wolfe moved for a mistrial:

"MR. REYES: I make a motion for mistrial, Your Honor.

"THE COURT: On what basis?

"MR. REYES: On the basis that in my opinion the jury in general has been tainted by everything we discussed this morning. The specific comment that concerns me at the end was that one of the jurors and in the individual questioning on him had indicated that some one had mentioned something in addition to which was a statement that one of the jurors had made a comment about being afraid when they went to the ball game last night, walking at the ball game. None of the jurors made that comment. That they in fact had said that to the other jurors.

"So obviously on top of what already has been going on there is clearly feelings, comments that are being made, they are not, that were not disclosed to us when we did the voir dire concerning that specific issue and that to me raises a m[o]re serious concern is that they are not being forthcoming let's say with their total feelings.

"And I understand that each of them have said yes, they can be fair and impartial jurors, but based on the taint that has already happened I just feel this point that edge in terms of fairness has just been tilted and at this point I don't feel my client can have a fair trial.

"THE COURT: Mr. Bartlett, do you wish to be heard?

"MR. BARTLETT: On behalf of [defendant] Anaya we will join in the request and comments of Mr. Reyes.

"THE COURT: Mr. Meyer, do you wish to be heard on the record?

"MR. MEYER: Based on Mr. Reyes did acknowledge that we individually pulled each juror on the record after a questioning, they acknowledged that they could still be fair and impartial jurors and that any concern they had was extraneous to any facts or evidence that have been presented in this case thus far, rather it was a civilian who was watching the trial and they said that they could essentially remove that from their head and still judge this trial fairly and impartially.

"THE COURT: I can't imagine how I could have been more exhaustive in terms of the supplemental voir dire of this jury panel. We took about an hour and a half to individually question each and every juror, had to do with their own personal experience and the experience and participating in or listening to conversation.

"Not one juror expressed any concern or opinion that they would not be able to fulfill their duties in this case. Not one juror changed their representation to you and to this court that they would be fair and impartial and wait until all the evidence is in before making a decision. Not one juror said that he or she would be influenced in any way by this very relatively small issue. And I will not repeat what's been talked about.

"But the one juror allegedly talked to her father without identifying the case, without discussing the facts of this case and most importantly without getting any input from outside this court proceeding about her job or about the facts relaying what she relayed. This jury pool has not been tainted by anything that has happened outside this courtroom and quite frankly, other than what has been thoroughly discussed nothing that has gone on in this courtroom.

"The comment that you related to or mentioned, Mr. Reyes, I think is simply one that was reflected by I don't remember her number, the juror who came in and said she and perhaps other jurors are concerned I think the quote was no more than they were at the beginning given the nature of the charges of this case and the comment about walking to a baseball park and being concerned wasn't tied at all to these defendants or anybody else in this process.

"I do understand the extended portion of your concern and that is nobody else relayed that information. But I don't believe that is a reflection take any one of these jurors are testifying under penalty of perjury wrongly or making misrepresents to this court about what has gone on and their ability to sit on the jury and be fair and impartial.

"All my questions lead up to them to the ultimate question to each juror and that is can you be fair and impartial in this case and each one to a person said that they could and would.

"I respect your opinion in all matters but however I must make a determination as to whether or not this jury has been tainted in any way or even the probability of that and I cannot find such given what we have done in this case and on that basis your motion is respectfully denied."

### B. The Applicable Law

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it"' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) It is not an abuse of discretion when a trial court denies a motion for mistrial after being satisfied that no injustice has resulted and the party's chances of receiving a fair trial have not been irreparably damaged. (*People v. Eckstrom* (1986) 187 Cal.App.3d 323, 330.)

"'When a trial court is aware of *possible* juror misconduct, the court "must 'make whatever inquiry is reasonably necessary'" to resolve the matter.' [Citation.] Although courts should promptly investigate allegations of juror misconduct 'to nip the problem in the bud' [citation], they have considerable discretion in determining how to conduct the investigation. 'The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry.'" (*People v. Prieto* (2003) 30 Cal.4th 226, 274.)

Section 1089 "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.'" (*People v. Bennett* (2009) 45 Cal.4th 577, 621.) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged. [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) "Such an inquiry is central to maintaining the integrity of the jury system, and therefore is central to the criminal defendant's right to a fair trial." (*People v. Kaurish* (1990) 52 Cal.3d 648, 694.) Whether to remove the juror is left to the discretion of the trial court, whose decision for removal is reviewed by "asking whether the grounds for such removal appear in the record as a demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.)

*C. Analysis*

Here, as illustrated above, the trial court conducted an immediate and thorough inquiry into any potential juror misconduct. Juror No. 104 in particular was extensively questioned.

There was no prejudicial misconduct here. As established by the trial court's inquiry, Juror No. 104 did not talk to her father about facts relating to the case or even identify the particular case. Rather, she expressed only her fear of an audience member. A jury is instructed that it shall not converse about "any subject connected with the trial." (§ 1122, subd. (a)(1).) We find that an audience member or member of the public observing the trial proceedings is not a "subject connected with the trial." (See, e.g., *People v. Loot* (1998) 63 Cal.App.4th 694, 697 [prosecutor was a "subject connected with the trial" and thus juror's discussion of his personal life with nonjuror was misconduct].) For that same reason, Juror No. 104's conversations with other jurors about any fear perceived after having been stared at by a member of the audience—and even their own similar apprehension—is not a "subject connected with the trial." Moreover, Juror No. 104 specifically indicated that the fear she was expressing did *not* relate to defendants. She also indicated that nothing else that had occurred during the course of the trial served to cause her fear. The trial court was satisfied with Juror No. 104's responses, as well as the responses of the entire jury panel following its inquiry. Notably too, counsel for defendants did not ask additional questions of any panel member despite being given an opportunity to do so. Lastly, the trial court stated that it had not observed any troubling behavior by the spectator in question.

Here, following its exhaustive inquiry, the trial court noted that no juror expressed any concern that he or she would be unable to fulfill his or her duties, no juror indicated he or she was incapable of being fair and impartial or incapable of waiting until all the evidence had been admitted before making a decision, and no juror indicated he or she would be influenced "in any way by this very relatively small issue."[n.22] As a result, the trial court concluded that the jury had not been "tainted in any way or even the probability of" having been tainted by the conduct of Juror No. 104 or her fellow jurors in conversing about the staring audience member. We defer to the observations and credibility determinations of the trial court. (*People v. Pride* (1992) 3 Cal.4th 195, 260.)

> [n.22] The jury was instructed that it "must use only the evidence that was presented in this courtroom. 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence." Perceptions related to possible actions by members of the audience are not evidence to be considered by the jury.

In *People v. Panah* (2005) 35 Cal.4th 395, the defendant's supporters "were following or 'shadowing' the jurors during breaks in their deliberations, while others, including his mother, were clustering near the jury while it was assembling on breaks." (*Id*. at p. 480.) The trial court reported that a juror had told the bailiff she was intimidated by the presence of these supporters. A male juror was overheard expressing relief that the jury did not have to assemble on a certain floor, "presumably to avoid contact with defendant's supporters." (*Ibid.*) The Supreme Court concluded that the jurors' "understandable concern [did] not amount to misconduct." There was no evidence the jury was biased against the

defendant or that any bias affected the jury's deliberations, and nothing in the record supported the defendant's claim that he was denied an impartial jury. (*Ibid.*) We conclude similarly here. Following the trial court's thorough inquiry, there is no evidence the jury was biased against defendants or that any bias affected the jurors' deliberations, denying defendants the right to an impartial jury.

Defendants contend "the record contains no statement by juror #104 that despite her fears about the audience member, she could remain fair and impartial as a sitting juror," and that "a presumption that she would have confirmed her lack of bias would amount to sheer speculation." We agree with the former and disagree with the latter.

As evidenced by the quoted portion of the inquiry provided above, Juror No. 104 was not expressly asked whether she could remain fair and impartial. Nevertheless, it is not "sheer speculation" to conclude she would have confirmed her lack of bias had she been asked. During the proceedings concerning this incident, the trial court stated on several occasions that each juror said he or she could remain fair and impartial. Neither defense attorney objected to the accuracy of the court's statements. In fact, in arguing his motion for mistrial, attorney Reyes expressly acknowledged "that each of them have said yes, they can be fair and impartial jurors." The prosecutor reiterated this sentiment in arguing against the motion: "[W]e individually pulled each juror on the record after a questioning, they acknowledged that they could still be fair and impartial jurors." Given the foregoing comments and circumstances on this record, it is not speculation to conclude Juror No. 104 would have affirmed her ability to remain fair and impartial despite her apprehension concerning the audience member.[n.23]

> [n.23] The audience member at issue apparently elected to forgo attending and observing future trial proceedings.

Even assuming for the sake of argument misconduct occurred here, our high court has explained that

> "'before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial* …. [T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' [Citation.]" (*People v. Danks* (2004) 32 Cal.4th 269, 304 [unsolicited comments from one juror's "pastor, [another juror's] conversation with her pastor, and the introduction of the Bible passages to the jury room were misconduct, but … this misconduct was not prejudicial"].)

This record reveals only "imperfection short of actual bias." Among the factors to be considered when determining whether the presumption of prejudice has been rebutted are "'the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.'" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 256.) The nature and seriousness of the assumed misconduct is minimal. Juror No. 104's mention to her father of her fear of an audience

member, and the discussions had amongst a few of the panel members on the same subject, do not directly relate to the subject of the trial or even to defendants. The comments did not concern facts elicited during trial. Thus the nature and seriousness of any assumed misconduct is slight. A review of the entire record finds no reasonable probability of actual harm to defendants. Accordingly, we also find the trial court did not err in denying defendants' motion for mistrial.

(ECF No. 1 at 106–20).

In <u>Smith v. Phillips</u>, the Supreme Court declared:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in <u>Remmer</u>[7] and held in this case.

455 U.S. 209, 217 (1982). <u>Smith</u> involved a juror in a state criminal trial who, during the trial, applied for an investigator position in the state prosecutor's office. <u>Id.</u> at 212. Although the prosecuting attorneys knew of the juror's application, they chose not to inform the court or the defense until after the jury returned the verdict. <u>Id.</u> at 212–13. After holding a hearing in which the juror and prosecutors testified, the state trial court denied the defendant's motion to vacate his conviction, finding that the juror was not biased and that the evidence did not suggest a "sinister or dishonest motive" on the part of the prosecutors. <u>Id.</u> at 213–14. The Supreme Court held that the post-trial hearing satisfied due process and that "[o]f equal importance, this case is a federal habeas action in which Justice Birns' findings are presumptively correct under 28 U.S.C. § 2254(d)." <u>Id.</u> at 218.

Here, the trial court promptly held a hearing after learning of Juror No. 104's comments to her father regarding her concerns about the audience member. When Juror No. 104 revealed that other jurors had expressed similar sentiments, the trial court proceeded to question all the

---

[7] <u>Remmer v. United States</u>, 347 U.S. 227 (1954) (finding reversible error where the district court did not conduct a hearing on a motion for new trial based on a third-party communication to a juror that he could profit by bringing in a verdict favorable to the defendant that was followed by a mid-trial investigation of the incident by the Federal Bureau of Investigation).

jurors and alternate jurors. After questioning each juror, the trial court concluded that "[e]ach and every member of the jury panel after discussion has fully and freely represented that they remain and are still able to be a fair and impartial jurors [*sic*] in this case and render a decision according to the instructions and the law that I gave them." (4 RT 239). The California Court of Appeal found that the trial court conducted a proper and "exhaustive inquiry" into the juror misconduct and "defer[red] to the observations and credibility determinations of the trial court" that the jurors remained fair and impartial. (ECF No. 14 at 117, 118).

The Court finds that the California Court of Appeal's decision is not contrary to, or an unreasonable application of, clearly established federal law.[8] After learning of the juror misconduct, the trial court conducted a hearing in compliance with <u>Remmer</u> and <u>Smith</u>. The state court's conclusion that the jurors remained fair and impartial is not an unreasonable determination of fact in light of the record. The California Court of Appeal's denial of the juror misconduct claim is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this claim and it must be denied.

## IV.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be

---

[8] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." <u>Parker v. Small</u>, 665 F.3d 1143, 1148 (9th Cir. 2011). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **May 6, 2016**

UNITED STATES MAGISTRATE JUDGE